IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
**Jun 28, 2024**
Lucy H. Carrillo, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. NO. 22-00061 DKW |
| Plaintiffs, | 1) ORDER DETERMINING DEFENDANT LACKS COMPETENCE TO STAND TRIAL; AND |
| vs. | 2) FINDINGS AND RECOMMENDATION TO GRANT GOVERNMENT'S REQUEST FOR ORDER AUTHORIZING INVOLUNTARY MEDICATION TO RESTORE COMPETENCE TO STAND TRIAL |
| SHAWN KHOUNDARA, | |
| Defendant. | |

## 1) ORDER DETERMINING DEFENDANT LACKS COMPENTENCE TO STAND TRIAL; AND 2) FINDINGS AND RECOMMENDATION TO GRANT GOVERNMENT'S REQUEST FOR ORDER AUTHORIZING INVOLUNTARY MEDICATION TO RESTORE COMPETENCE TO STAND TRIAL

On January 26, 2024, this matter came on for an evidentiary hearing before the Honorable Rom Trader. ECF No. 69. Assistant United States Attorney Christine Olson appeared on behalf of the United States of America, and Assistant Federal Defender Melinda K. Yamaga appeared on behalf of Defendant Shawn Khoundara, who was present and in custody. Investigator Randall Fichte from the Office of the Federal Public Defender was also present. Two issues were presented for this Court's determination: 1) whether Defendant Shawn

Khoundara's ("Defendant") is competent to stand trial; and 2) if the Court determines that Defendant lacks competence, whether the administration of involuntary medication would restore Defendant's competence to stand trial pursuant to *Sell v. United States*, 539 U.S. 166 (2003) ("Sell").

The Court **FINDS** by a preponderance of the evidence, and the parties agree that, Defendant suffers from a delusional disorder, the grandiose and persecutory type, and is presently mentally incompetent to stand trial.[1]  The Court also **FINDS** by clear and convincing evidence that Defendant's circumstances are such that the four *Sell* factors are met and **RECOMMENDS** that the district court issue an order authorizing the involuntary administration of medication of Defendant to restore competency to stand trial.

## BACKGROUND

On July 20, 2022, the Defendant was arrested pursuant to the *Criminal Complaint*, charging him with Cyberstalking, in violation 18 U.S.C § 2261A(2)(B). ECF No. 1 & 2.  On July 28, 2022, a federal grand jury returned an *Indictment* for the same offense.  ECF No. 13.  The *Indictment* alleged that, between February 2022 and July 2022, Defendant:

---

[1] Pursuant to CrimLR57.1(i), "[i]n criminal cases, each magistrate judge shall exercise all the powers conferred or imposed by law and the Federal Rules of Criminal Procedure and may: . . (i) hear motions and enter non-dispositive orders relative to mental competency under 18 U.S.C. 4241 et seq. . . ."

with the intent to harass and intimidate another person . . . used an interactive computer service, electronic communication service, electronic communication system of interstate commerce, and facility of interstate and foreign commerce, including but not limited to the Internet and cellular telephone networks, to engage in a course of conduct that caused, attempted to cause, and would reasonably be expected to cause substantial emotional distress to [an adult female].

*Id.*

On October 11, 2022, the Defendant filed his *Motion for Competency Evaluation* ("Motion").  ECF No. 28.  On October 20, 2022, the Court granted the *Motion*, finding "reasonable cause that Defendant may be presently suffering from a mental disease or defect that may affect his ability to understand the nature and consequences of the proceeding[s] and assist Ms. Yamaga in his defense."  *Id*. The Court then remanded "Defendant to the care and custody of the Attorney General of the United States to be transported as soon as possible to an appropriate Bureau of Prisons ("BOP") facility for a competency evaluation."  *Id.*  The Court filed its written order on October 25, 2022.  ECF No. 33.

Defendant was subsequently evaluated at the Federal Detention Center – SEATAC.  ECF No. 38.  On February 3, 2023, the Court received and filed under seal the *Forensic Evaluation* prepared by Cynthia Low, Ph.D. ("Dr. Low's Report").  *Id.*

On February 9, 2023, Defendant was present for an on-record status conference at which both the Government and Defendant stipulated to *Dr. Low's Report*.  ECF No. 42.  The Court found Defendant was not competent to proceed

and ordered Defendant to undergo competency restoration. *Id.* The Court entered

its written order on February 10, 2023. ECF No. 43.

Defendant was subsequently transported to and evaluated at the Federal

Medical Center in Butner, North Carolina ("FMC Butner"). ECF No. 46. On

September 6, 2023, the Court filed under seal the *Forensic Evaluation* ("Dr.

Sharf's Report") prepared by Allyson Sharf, Ph.D. ("Dr. Sharf"). ECF No. 47.

Soon thereafter, difficulties arose in transporting Defendant to the District of

Hawaii for a competency hearing. ECF No. 53.

On October 11, 2023, although the Defendant was not present, the Court

convened a conference with counsel to discuss logistics and scheduling. *Id.* At

that time, Defendant's attorney, Melinda Yamaga, represented that Defendant

"intends to contest the findings and opinions of the forensic examiner detailed in

the [*Dr. Sharf's Report*]." *Id.* In addition, Ms. Yamaga represented that Defendant

intended to retain his own defense expert and requested Defendant be transported

back to Hawaii as soon as possible. *Id.* As a result, this Court issued orders

requiring Defendant's return to this district. *Id.*; ECF No. 54. The Court also

ordered FMC Butner to submit an addendum to *Dr. Sharf's Report* to "detail any

proposed treatment plan, to include recommended medication and dosage, as well

as, other forensic information, findings or opinions relating to the factors required

4

under [*Sell*]."  ECF No. 53.  The Court then rescheduled the competency hearing for November 30, 2023.  *Id.*

On November 1, 2023, the Court filed the *Forensic Addendum* prepared by Charles Cloutier, M.D. ("Dr. Cloutier's Report").  ECF No. 59.

On November 16, 2023, the Court convened a conference at which Defendant was present after having returned to this district on November 14, 2023.  ECF No. 60.  At that time, since the defense expert had not yet had an opportunity to examine Defendant, the Court vacated the competency hearing scheduled for November 30, 2023 and scheduled a status conference for December 14, 2023.  *Id.*

By agreement of the parties, at the December 14, 2023 conference, the Court scheduled the competency hearing for January 26, 2024.  ECF No. 61.  At that time, the Court also ordered supplemental briefing concerning the Governments' request for an order authorizing forced medication to restore Defendant's competency.  *Id.*  Thereafter, the parties timely filed their supplemental briefs and exhibits.  ECF Nos. 62, 63, 65, 66 & 68.  This included a *Competency Evaluation* report by Defendant's expert, Robert Cosby, Psy.D., ("Dr. Cosby") ("Dr. Cosby's Report") which was filed under seal.  ECF No. 65-3.

## **DISCUSSION**

The first issue before the Court is whether Defendant is competent to stand trial.  After reviewing the expert witness reports and testimonies of Dr. Sharf, Dr.

Cloutier and Dr. Cosby, Defendant's record in this case and applicable law, the Court finds that Defendant is not competent to stand trial as explained below.

In finding that Defendant is not competent to stand trial, the Court next evaluates the second issue of whether Defendant's case meets the four factors under *Sell*, such that the involuntary administration of medication solely for trial competence purposes should be permitted in this case. In this case, the Court finds that the *Sell* factors are met for the reasons stated below.

## I.   <u>COMPETENCY</u>

During the competency hearing on January 26, 2024, the parties did not dispute the experts' collective opinions regarding Defendant's competency. ECF No. 69. Upon further inquiry by the Court, both the Government and the defense confirmed that they accepted the findings and opinions of the experts that Defendant lacked competency to stand trial. *Id*.; ECF No. 70 at PageID.339-340. The Court has carefully reviewed the reports submitted by the expert witnesses and their testimony on January 26, 2024. The Court finds that Defendant is not competent to stand trial.

It is a violation of due process if an individual is convicted when he is legally incompetent. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). In order to determine that Defendant is not competent to stand trial, the court must find, and

the Government has the burden of establishing, by a preponderance of the evidence that:

> the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense[.]

18 U.S.C. § 4241(d); *United States v. Frank*, 956 F.2d 872, 875 (9th Cir. 1991). Evidence that may be considered are medical opinions and observations of the defendant. *See Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010). In this case, all three expert witnesses, Dr. Sharf, Dr. Cloutier and Dr. Cosby have found that Defendant suffers from a delusional disorder.

Dr. Sharf diagnosed Defendant with delusional disorder, persecutory type, and opined that this mental disease "renders him not competent to stand trial." ECF No. 65-1 at PageID.268 & 271. Dr. Sharf's diagnosis was based on, *inter alia*, her formal and informal interviews and interactions with Defendant over the course of approximately four months at FMC Butner. *Id*. at 263-68. Dr. Cloutier also diagnosed Defendant with delusional disorder, persecutory type, based upon his review of, *inter alia*, *Dr. Sharf's Report*, the Federal Bureau of Prisons (BOP) electronic medical and psychological records and *Dr. Low's Report*. ECF No. 65-2 at PageID.275-76. Cloutier's diagnosis is also based upon his evaluation of Defendant and discussions with FMC Butner's psychiatric nurse practitioner regarding Defendant's case. ECF No. 70 at PageID.371. Dr. Cosby also

diagnosed Defendant with delusional disorder, both grandiose and persecutory type, and found that Defendant is not competent to stand trial.  ECF No. 65-3 at PageID.301 & 304 (Although Defendant "understands the nature of legal proceedings against him[,] he lacks the capacity to assist in his defense due to mental disease.").  Dr. Cosby's opinion was also based upon a three-and-a-half-hour interview with Defendant, *Dr. Low's Report*, *Dr. Sharf's Report*, *Dr. Cloutier's Report* and various studies.  *Id*. at 290.

The evidence presented by and opinions of these three experts --  in addition to *Dr. Low's Report* diagnosing Defendant with delusional disorder, grandiose and persecutory types, as well as unspecified methamphetamine-related disorder – indicate that Defendant is not competent to stand trial.  *See* ECF No. 65-1 at PageID.263.  The Court **FINDS** that by a preponderance of the evidence that Defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is not able to properly assist in his defense.  Accordingly, the Court **FINDS** that Defendant is not competent to stand trial.  The Court must next evaluate whether the involuntary administration of medication for trial competency purposes should be permitted under the standard articulated in *Sell*.

## II.    <u>**FORCIBLE MEDICATION**</u>

The standard for determining whether courts should permit the involuntary administration of medication for trial competency purposes is set forth by the Supreme Court in *Sell*.  Under *Sell*:

> [T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

*Id*. at 179.  Under this standard, the following four factors must be satisfied for the Court to approve the involuntary medication of the Defendant solely for trial competence purposes:

(1)    That important governmental interests are at stake in prosecuting the defendant for the charged offense;

(2)    That involuntary medication will significantly further those concomitant state interests, i.e., it is substantially likely to restore the defendant to competency and substantially unlikely to cause side effects that would impair significantly his ability to assist in his defense at trial;

(3)    That involuntary medication is necessary to further those interests, i.e., there are no less intrusive treatments that are likely to achieve substantially the same results; and

(4)    That administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition.

*United States v. Onuoha*, 820 F.3d 1049, 1053 (9th Cir. 2016) (internal quotations omitted) (citations omitted).  "Each of these factors must be proven by clear and convincing evidence."  *Id.* (citing *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 687-88 (9th Cir. 2010)) (citation omitted).

Although this standard has its origins from the Supreme Court decisions in *Washington v. Harper* ("Harper"), 494 U.S. 210 (1990), and *Riggins v. Nevada* ("Riggins"), 504 U.S. 127 (1992), *Harper* and *Riggins* involved the involuntary administration of medication when an inmate is a significant danger to themselves or others.  The standard under *Harper* and *Riggins* is thus based on "the necessity, of considering the State's interests in prison safety and security" and serves a purpose that is different from the rationale in *Sell*.  *Harper*, 494 U.S. at 223.

In this case, the Government is not alleging that Defendant poses a significant danger to himself or others.  Instead, the decision to permit the involuntary administration of medication is based upon the Government's interest in prosecuting this case.  For that reason, it makes sense that the Court must evaluate the factors described in *Sell* and that the involuntary administration of drugs solely for trial competence purposes should be rare.  *Sell*, 539 U.S. at 180. Nevertheless, however rare involuntary administration of drugs for trial competence purposes may be, if the *Sell* factors are met, "the Constitution permits the Government [to] involuntarily . . . administer antipsychotic drugs to a mentally

ill defendant facing serious criminal charges in order to render that defendant competent to stand trial[.]" *Id*. at 179.  In this case, the Court finds that the four *Sell* factors have been met and that the Government should be permitted to forcibly administer medication for the reasons explained below.

### A.    The First Factor: Government's Significant Interest in Bringing to Trial a Mentally Ill Defendant

The evaluation of the first *Sell* factor is a two-step inquiry.  *United States v. Onuoha*, 820 F.3d 1049, 1054 (9th Cir. 2016) (citation omitted).  First, the Court must evaluate "whether the alleged crime is sufficiently 'serious' to establish an important governmental interest."  *Id.* at 1054 (citing *United States v. Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014)) (citation omitted).  Second, if the Court finds there to be a significant governmental interest, the Court evaluates "whether any 'special circumstances' lessen that interest."  *Id*. (citation omitted).

### 1.    The Defendant is Facing Serious Criminal Charges

The Court must determine whether the crime alleged in this case is a serious crime such that there is an important governmental interest.  "The Government's interest in bringing to trial an individual accused of a <u>serious crime</u> is important" regardless of whether the serious crime is against a person or against property.  *See Sell*, 539 U.S. at 180 (emphasis added).  The rationale for this interest is that "the Government seeks to protect through application of the criminal law the <u>basic human need for security</u>."  *Id*. (emphasis added) (citations omitted).

The Defendant is charged with the crime of cyberstalking pursuant to 18 U.S.C. § 2261A(2)(B), which is punishable by up to five years (60 months) in prison and is a class D felony offense.  18 U.S.C. § 2261(b); 18 U.S.C. § 3559. The Ninth Circuit has held that "U.S. Sentencing Guidelines range is 'the appropriate starting point [to determine whether a crime is serious]' because it is the 'best available predictor of the length of a defendant's incarceration.'" *Onuoha*, 820 F.3d at 1054-55.  In the past, the Ninth Circuit has found crimes with a Sentencing Guideline of less than 60 months to be a serious crime.  For example, in *Onuoha*, a Sentencing Guideline range of 27-33 months was sufficient to find that the alleged crimes were serious.  *Id.* at 1055.  In *Gillenwater*, the Court found a crime to be serious even though the Sentencing Guideline range was between 33 to 41 months.  *Gillenwater*, 749 F.3d at 1101.  When viewed in light of these cases, it appears that, at least at the outset, the Sentencing Guideline for the crime being charged in this case falls within the Sentencing Guideline range that in the past has been sufficient to find (an) alleged crime(s) to be serious so as to indicate an important governmental interest.

In determining whether a crime is serious, the Supreme Court has also required that the courts "consider the facts of the individual case in evaluating the Government's interest in prosecution."  *Onuoha*, 820 F.3d at 1055 (citation omitted).  This consideration includes the "specific facts of the alleged crime as

12

well as the defendant's criminal history." *Id*.  The facts of this case fall squarely

into the category of being a serious crime.  That Defendant has no prior criminal

convictions does not detract from fact that the nature of the crime charged is

serious.  ECF No. 62 at PageID.192 (Defendant "has absolutely no criminal

convictions").  The facts of this case are that:

> [D]efendant relentless[ly] stalked and harassed a woman known to him
> online, and although not charged conduct, also was allegedly driving around
> a van with a metal cage and weapons in an attempt to kidnap and sexually
> assault the object of his interest.

ECF No. 68 at PageID.324.  These facts are not to be taken lightly.  As a result of

Defendant's actions, the woman "changed her telephone number[,] . . . no longer

feels safe . . . [and] changed her everyday behavior as a result . . . she constantly

looks around to see if someone is following her"  ECF No. 1 at PageID.13.  The

Defendant's actions threatened the woman's basic needs for security to the extent

of causing her to change her behavior out of fear for her safety.  In this case, the

Government certainly has a significant interest to protect "the basic human need

for security."  The Third Circuit has also stated that "[c]yberstalking is a serious

crime that calls for serious punishment." *United States v. Yung,* 37 F.4th 70, 83

(3d Cir. 2022).  Defendant even admits that cyberstalking "is no doubt a serious

crime[.]"  ECF No. 62 at PageID.191 ("The facts of this case as outlined in the

Criminal Complaint (Dkt. 1) allege a relatively serious offense.").  For these

reasons, the Court finds that the Defendant is facing serious criminal charges such

that there is a significant governmental interest at stake.

### 2.    There are No Special Circumstances that Lessen the Government's Interest.

The Court must next evaluate whether any special circumstances exist that

diminish the Government's interest.

> The [Supreme Court] mentioned several examples of "special circumstances" that diminish the government's interest in prosecution, including the potential for civil commitment, the length of time needed to restore a defendant to competency, the effect of the potential delay on the government's interest in timely prosecution, the length of time the defendant has already been confined, and constitutional requirements of a fair trial.

*Onuoha*, 820 F.3d at 1054.  Defense counsel claims that Defendant's "time in

custody, pending civil commitment, and state court cases diminish the

[G]overnment's interest."  ECF No. 62 at PageID.193.  Defense counsel explains

that Defendant has been in custody for 18 months[2] and "[t]his length of time, when

considered in context of the 5-year maximum possible sentence and the 24-30

months of imprisonment suggested by [the] guideline range, is substantial."  *Id*.

Defense counsel also explains that Defendant has a pending federal civil

commitment proceeding, which defense counsel argues "serves as a safeguard such

that if found dangerous under that standard, [Defendant] will not be released into

---

[2] As of the date of the instant findings and recommendations, the Court believes that Defendant has been in custody for approximately 23 months following his arrest on July 20, 2022.

the community." *Id*. Defense counsel further explains that Defendant has pending state court cases that "carries a maximum penalty of ten years' imprisonment which makes it the most serious offense [Defendant] is facing." *Id*. (citing Haw. Rev. Stat. § 134-25).

The Court does not find that Defendant's 23 months in custody relative to the 60-month maximum sentence is a special circumstance that diminishes the Government's interest. As noted by the Ninth Circuit, "the Guidelines range is only the starting point in determining whether the government has an important interest in prosecution . . . and it is not the only factor that should be considered because it does not reflect the full universe of relevant circumstances." *Onuoha*, 820 F.3d at 1055 (citing *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008) (internal quotations omitted) (emphasis added). Defendant stalked and harassed a woman to the extent of driving around in a van with a metal cage and with weapons intending to kidnap and sexually assault this woman. ECF No. 68 at PageID.324. Defendant's criminal conduct is sufficiently serious, and is in fact so horrific such that the government's interest in protecting the basic human need for security is undeniably strong.

That Defendant has a pending civil commitment and state court criminal cases also do not constitute special circumstances that would diminish the Government's interest in light of Defendant's criminal conduct. Defendant argues

that his pending civil commitment and state court cases are alternative processes through which any risk will be managed, and Defendant would be monitored even after being released. ECF No. 62 at PageID.193. The pending civil commitment case is before the United States District Court for the Eastern District of North Carolina Western Division. ECF No. 52-2. Defendant argues that "[t]he civil commitment proceeding serves as a safeguard[,]" but such a "safeguard" is qualified by "if" in that there is no indication that there is any degree of certainty that Defendant will be civilly committed. ECF No. 62 at PageID.193-94. In fact, there was a pending *Motion to Hold Case in Abeyance and Incorporated Memorandum of Law* filed in the civil commitment case, and the Government had requested that the civil commitment case be "held in abeyance pending resolution of the competency proceedings by the United States District Court for the District of Hawaii. ECF No. 52-2 at PageID.148.

Similarly, the state court criminal cases before the State of Hawaiʻi, First Circuit Court are pending. In state court, Defendant is charged with Terroristic Threatening in the First Degree which is a class C felony, punishable by up to five years in prison. *See* State of Hawaii case 1CPC-21-0000730; Haw. Rev. Stat. §706-660(b). Defendant is also charged with Place to Keep Pistol or Revolver which is described as a class B felony, punishable by up to ten years in prison. *See* State of Hawaii case 1 CPC-22-0001370; Haw. Rev. Stat. § 706-660(a). However,

there is no indication as to the likelihood of the commitment of the Defendant. There is a possibility that Defendant may be committed to the Hawaii State Hospital in the state court matters, but such an outcome has yet to be achieved.

These arguments are all merely possibilities, and without more concrete information as to the likelihood of these possibilities and the possible duration of any commitment, the Court cannot find that these possibilities are special circumstances that weigh so heavily against the Government's interest that it tips the scale in favor of finding that the Government's strong interest in this case is lessened. *See United States v. Gomes*, 387 F.3d 157 (2d Cir. 2004) ("little, if any, evidence on the record to suggest that Gomes would qualify for civil commitment."). However, even with additional information, "general deterrence for the benefit of society is served when a person is convicted of a serious crime, thus deterring others from making the same mistake." *Onuoha*, 820 F.3d at 1057. In this case, the Government has a strong interest in deterring others especially in light of Defendant's conduct of stalking a woman online and intending to kidnap this woman with a van by using a metal cage and weapons. *See Sell*, 539 U.S. at 180-81 ("Courts . . . must consider the facts of the individual case in evaluation the Government's interest in prosecution."). Accordingly, the Court finds that there are no special circumstances that lessen the Government's strong interest,

especially in light of the facts in this case, to protect the basic human need for security.  Therefore, the first *Sell* factor has been met.

**B.     The Second Factor: The Involuntary Administration of Medication Significantly Furthers those Concomitant State Interests and Does Not Pose Any Side Effects that Would Affect Defendant's Ability to be Competent to Stand Trial**

The second *Sell* factor requires that the Court find that the involuntary administration of medication will be substantially likely to render Defendant competent to stand trial.  In this case, the Government presented two expert witnesses, Dr. Sharf and Dr. Cloutier (collectively, "Government witnesses"), to establish by clear and convincing evidence that forcible medication would be substantially likely to render Defendant competent to stand trial.  The defense presented Dr. Cosby to rebut the Government witnesses' findings.  Dr. Cosby opined that although forcible medication would have a "reasonable probability or possibility" of restoring Defendant's competence to stand trial, Dr. Cosby could not agree that forcible medication would be substantially likely to restore Defendant's competency.  ECF No. 70 at PageID.434.  After careful review of the testimony, reports and evidence provided by these three expert witnesses, the Court finds that there is a substantially likelihood that the involuntary administration of medication will restore Defendant's competence to stand trial.

1.     **Dr. Sharf Opines that Involuntary Administration of Medication is Substantially Likely to Restore Defendant's Ability to be Competent to Stand Trial**

Dr. Sharf is the Government's expert witness and is a forensic psychologist employed at FMC Butner.  ECF No. 65-1 at PageID.260 & 272.  Dr. Sharf's September 1, 2023, Forensic Evaluation was accepted as testimony supplemented by her in-court testimony provided via video at the January 26, 2024 hearing.  *See* ECF No. 69.  Defendant was admitted to FMC Butner on May 16, 2023.  ECF No. 65-1 at PageID.263.  Between May 16, 2023 and September 2023, Dr. Sharf met with Mr. Khoundara approximately every other week.  *Id*. at 263-68.  Sometimes the meetings were a few minutes long and others were longer interviews.  *Id*.  Dr. Sharf diagnosed Defendant with delusional disorder, persecutory type, and believes that if forcibly medicated, it is substantially likely that Defendant's competency would be restored to stand trial.  *Id*. at 270-72.

To arrive at her opinion, Dr. Sharf reviewed Mr. Khoundara's history and physical, EKG results, Magnetic Resonance Imaging – Brain results, Revised-Competency Assessment Interview, competency restoration group notes, behavioral observations, clinical interviews, indictment, criminal docket, *Dr. Low's Report* dated February 2, 2023, discovery material, Federal Bureau of Prisons Psychology Data Systems records from December 6, 2022, to September 1, 2023, Federal Bureau of Prisons Electronic Medical records from November 20,

2022 to September 1, 2023, and Queen's Medical Center records from January 15, 2022 to June 16, 2022.  *See* ECF No. 65-1 at PageID.261.  Throughout Defendant's stay at FMC Butner, the staff at the facility observed and reported on Defendant's behavior.  *Id*. at 260, 263-268.  Dr. Sharf relied on these frequent and varied observations and comments by medical, correctional, and other mental health staff throughout Defendant's stay at FMC Butner.  *Id*. at 261.  Dr. Sharf also based her opinion on her evaluation, her personal experience, and Robert E. Cochrane et al., *The Sell Effect: Involuntary Medication Treatment is a "Clear and Convincing" Success,* Law and Human Behavior 37:107-116 (2013) ("Cochrane Study").  *Id*. at 344-47.

Dr. Sharf stated during her testimony that she relied in part on the *Cochrane Study* to opine that there is a substantial likelihood that Defendant would be restored to competency with antipsychotic medication.  *Id*.  In the *Cochrane Study*, 79 percent competency rate was achieved for all mental disease or disorders evaluated under that study, and for delusional disorder patients, the rate of restoration was 73 percent (study was based on 15 individuals that were diagnosed with delusional disorder).  *Id*. at 350.  Dr. Sharf also testified that an individual's circumstances are dependent on other factors which cannot be accounted for across the board.  *Id*. at 363-64.  When asked to explain why Dr. Cosby and her opinion differed, Dr. Sharf explained that the research studies relied upon by Dr. Cosby

were not relevant to this case. *Id.* at 348. Dr. Sharf explained that this is because Dr. Cosby failed to take into account that even though an individual may exhibit some symptoms of their mental illness, that individual may still be competent to stand trial. *Id.*

2.    **Dr. Cloutier Opines that Involuntary Administration of Medication is Substantially Likely to Restore Defendant's Ability to be Competent to Stand Trial**

Dr. Cloutier, M.D. is the Government's expert witness and is a psychiatrist at FMC Butner. *Dr. Cloutier's Report*, dated October 23, 2023, was accepted as testimony supplemented by his in-court testimony provided via video at the January 26, 2024 hearing. *See* ECF No. 65-2. Dr. Cloutier met with Defendant on May 18, 2023 and June 15, 2023. ECF No. 70 at PageID.371. Dr. Cloutier diagnosed Defendant with delusional disorder, persecutory type. ECF No. 65-2 at PageID.275. Dr. Cloutier opines that Defendant "is very likely to respond to antipsychotic medication and reach competency over 70% of the time with antipsychotic medication." ECF No. 65-2 at PageID.277. Consistent with this opinion, Dr. Cloutier finds that the administration of involuntary antipsychotic mediation is substantially likely to restore Defendant's competency to stand trial. *Id.* at 279.

Dr. Cloutier reviewed Defendant's Federal Bureau of Prisons electronic medical and psychological records, *Dr. Low's Report* and *Dr. Sharf's Report* to

arrive at his opinion.  *See id*. at 275.  Dr. Cloutier relied on his personal experience, the *Cochrane study*, and a study by Bryon L. Herbel and Hans Stelmach, *Involuntary medication Treatment for Competency Restoration of 22 Defendants With Delusional Disorder*, J Am. Acad. Psychiatry Law 35:47-59 (2007) ("Herbel Stelmach study").  *Id*.; ECF No. 70 at PageID.397.

Dr. Cloutier explained that delusional disorder "does not lend itself well to research" and because of this, there are "no controlled trials for the treatment of delusional disorder."  ECF No. 70 at PageID.372.  However, Dr. Cloutier explains that "there are a lot of observational studies that show that the response rate for looking at treating psychosis" is high, including the *Cochrane Study* which shows that the response rate for the treatment of delusional disorder was 73 percent.  *Id*. at 372-73.  Dr. Cloutier explains that when he discusses the restoration of an individual's competency, he is not claiming that through treatment, the psychosis will be completely eliminated.  *Id*. at 379.  He explains that the goal of treatment, and what he considers effective, is diminishing the intensity of the delusional beliefs so that the Defendant can competently proceed with trial as opposed to a complete cure.  *Id*.  Dr. Cloutier also notes that he relies on the *Cochrane Study* in arriving at his opinion.  *Id*. at 380.  Dr. Cloutier explains that the results in the *Cochrane Study* for the general treatment of psychosis, beyond the treatment of individuals with delusional disorder, also support his finding that Defendant is

substantially likely to be restored to competency for trial purposes.  *Id*.  Dr.

Cloutier views the study of the treatment of psychosis in general as one more piece

of information in addition to the results specifically derived from those with

delusional disorder, that shows that involuntary treatment is effective.  *Id*. at 381-

82 & 385.

Dr. Cloutier further explains that he relies on his approximately 20 years of

substantial direct personal experience with patients with delusional disorder and

explains that the majority of patients that were treated responded to medication.

*Id*. at 375.  He explains that he also considered that Defendant did not have any

issues that would lower his probability of being restored to competency such as a

neurocognitive disorder, intellectual disability or traumatic brain injury.  *Id*. at 381-

82.

> **3.    Dr. Cosby Opines that Involuntary Administration of Medication
> is Reasonably Likely to Restore Defendant's Ability to be
> Competent to Stand Trial**

Dr. Cosby is Defendant's expert witness and is a clinical and forensic

psychologist employed by Inland NW Forensics, LLC and the Washington State

Office of Forensic Mental Health Services.  ECF No. 65-3 at PageID.311; ECF No.

70 at PageID.404, 406-07.  Dr. Cosby's December 9, 2023, Competency

Evaluation was accepted as testimony supplemented by his in-court testimony

offered at the January 26, 2024 hearing.  *See* ECF 65 Exhibit "D."  Dr. Cosby met

with Defendant on December 1, 2023, for approximately three and a half hours.
ECF No. 65-3 at PageID.290.  Dr. Cosby diagnosed Defendant with delusional
disorder, grandiose and persecutory type.  *Id*. at 301.

In writing his report, Dr. Cosby reviewed the Indictment in this case, *Dr.
Low's Report*, *Dr. Sharf's Report*, the *Dr. Cloutier's Report* including the attached
Appendix, Queen's Medical Center records, and peer-reviewed literature.  *Id*. at
291.  Dr. Cosby finds that the studies and data he reviewed "possibly support a
<u>reasonable probability</u> that restoration treatment with effective antipsychotic
medication will be successful for [Defendant].  *Id*. at 311 (emphasis added).  Dr.
Cosby explains that in his experience, he "cannot offer much additional
information" "[f]rom [his] experience working at an inpatient forensic hospital,"
but he has seen "delusional disorders improve with treatment, and others
demonstrate no improvement with treatment across Washington State's year-long
restoration timeframe."  *Id*. at 310.  Dr. Cosby claims that the reliance on the
*Cochrane* and *Herbel Stelmach* studies alone are problematic because the sample
sizes in those studies of individuals with delusional disorder were too small.  *Id*. at
306-07.  Dr. Cosby opines that the Government witnesses' reliance on "broad,
catch-all statistics" on the treatment of psychotic disorders as a whole and not
studies specifically on delusional disorder, is a mistake.  *Id*. at 306.  Dr. Cosby
opines that "the empirical data support that approximately 32% to 46% of

delusional disordered patients routinely treated with antipsychotic medications demonstrated notable improvements." *Id*. at 310.

### 4. There is a Substantial Likelihood that Involuntary Administration of Medication would Make Defendant Competent to Stand Trial

Two out of the three expert witnesses have found that, based upon the circumstances of Defendant's delusional disorder, medical history, and observed behavior at FMC Butner over a period of time, as well as the reliance upon their own experience with the disorder and studies conducted at FMC Butner under similar circumstances, there is a substantial likelihood that Defendant could be made competent for trial. Similarly, other courts have found that there is a substantial likelihood that defendants with delusional disorder, based on the circumstances of the defendant, can be made competent to stand trial through involuntary administration of antipsychotic medication. *See e.g.*, *United States v. Baschmann*, No. 10-CR-300-A, 2015 WL 346719, at *9-12 (W.D.N.Y. Jan. 23, 2015); *United States v. Milliken*, No. 305-CR6J-32TEM, 2006 WL 2945957, at *10 (M.D. Fla. July 12, 2006), *report and recommendation adopted in part*, No. 305-CR6J-32TEM, 2006 WL 2945950 (M.D. Fla. Oct. 13, 2006), and *report and recommendation adopted in part*, No. 3:05-CR-6-J-32TEM, 2007 WL 114001 (M.D. Fla. Jan. 10, 2007). Based upon the reports and testimony of Dr. Sharf and Dr. Cloutier, as well as on the studies they relied upon, the Court finds that there is

a substantial likelihood that that Defendant can be made competent through the involuntary administration of medication.

The Court finds the testimony and report of Dr. Sharf persuasive and instrumental in making its determination.  In particular, the Court notes that out of the three expert witnesses, Dr. Sharf appears to have spent the most time observing Defendant both during and outside a formal interview process; Dr. Sharf has had multiple formal and informal discussions with and observations of Defendant.  *See* ECF No. 65-1 at PageID.263-68.  Beginning on May 16, 2023 through September 2023, Dr. Sharf met with Defendant regularly and frequently.  *Id*.  In addition, Dr. Sharf had the benefit of reviewing and/or discussing Defendant's prognosis and potential treatment with other professionals evaluating Defendant at FMC Butner such as Defendant's treatment team, psychiatric nurse practitioner and other psychologists evaluating Defendant.  *Id*.  Dr. Sharf is familiar with the Competency Restoration group sessions and Illness Management and Recovery group sessions attended by Defendant at FMC Butner, and is familiar with Defendant's progress in those group sessions.  *Id*.  Dr. Sharf is thus in the best position to evaluate the potential effectiveness of forcible medication after having the benefit of being familiar with the circumstances of Defendant's behavior and nature of his delusional disorder, and the environment in which Defendant would likely be treated.

The Court found Dr. *Cloutier's Report* and testimony highly persuasive given that he is a medical doctor who not only is able to prescribe medications to patients but is also familiar with the different treatments available and the effectiveness of such medications to restore Defendant's competency for trial purposes. *See* ECF No. 70 at PageID.369. Further, Dr. Cloutier met with Defendant personally on at least two occasions and had the benefit of discussing Defendant's case on several occasions with the psychiatric nurse practitioner, who had also met with Defendant. *Id.* at 371. Notably, Dr. Cloutier explained during his testimony that the studies relied upon by Dr. Cosby are focused on the total remission of symptoms, but restoration of competency to stand trial does not require a complete cure. *Id.* at 385. Dr. Cloutier further explains that he and Dr. Sharp are therefore evaluating the Defendant and using their research with the goal of determining the probability of restoring Defendant's competency to stand trial and not the complete remission of the mental disease. *Id.*

Dr. Cosby disagrees with Dr. Sharf and Dr. Cloutier (collectively, "Government's witnesses") and claims that due to the small sample size, in addition to the lack of other safeguards such as control groups, placebos or standardized clinical assessments with rating scales, he does not find the *Cochrane* and *Herbel Stelmach studies* as persuasive. ECF No. 70 at PageID.398 & 436. As a result, Dr. Cosby bases his opinion on the three and a half hours he spent

evaluating Defendant in a formal interview setting and other studies that have a larger sample size. ECF No. 65-3 at PageID.290-91 & 308-10. Based upon these studies, Dr. Cosby opined that "the empirical data support that approximately 32% to 46% of delusional disordered patients routinely treated with antipsychotic medications demonstrated notable improvements." *Id*. at 310.

In particular, Dr. Cosby noted three different studies. Dr. Cosby cited a 2021 study consisting of 9,706 patients hospitalized with delusional disorder ("Lähteenvuo study").[3] *Id*. at 308. Dr. Cosby relies on the *Lähteenvuo study's* finding that 46% of patients with delusional disorders who were routinely treated with medication did not have subsequent psychiatric hospitalization during a five-year follow up period. *Id*. Dr. Cosby also relies on a 2016 study on the effectiveness of antipsychotics ("Muñoz-Negro study").[4] *Id*. at 309. The *Muñoz-Negro study* consisted of 385 delusional disorder cases among which 33.6% of the individuals had a "good treatment response." *Id*. Dr. Cosby also relied upon a 2020 study[5] with a sample size of 437 patients, which demonstrated that 32.3% of

---

[3] ECF No. 65-3 at PageID.308 (citing "Lähteenvuo, M. Taipale, H., Tanskanen, A., Mittendorfer-Rutz, E., & Tiihonen, J. (2021). Effectiveness of pharmacotherapies for delusional disorder in a Swedish national cohort of 9076 patients. *Schizophrenia Research*, 228, 367-372."

[4] ECF No. 65-3 at PageID.309 (citing "Muñoz-Negro, J.E., & Cervilla, J.A. (2016). A systematic review on the pharmacological treatment of delusional disorder. *Journal of clinical psychopharmacology*, 36(6), 684-690").

[5] ECF No. 65-3 at PageID.309 (citing "Muñoz-Negro, J.E., Gómez-Sierra, F.J., Peralta, V., González-Rodriguez, A., & Cervilla, J.A. (2020). A systematic review

patients demonstrated a "good response" to antipsychotic medication.  *Id.*  Based

upon these studies, other research cited in *Dr. Cosby's Report*, his review of the

Government witnesses' reports, and his interview with Defendant, Dr. Cosby

opined that "the available data possibly support a reasonable probability that

restoration treatment with effective antipsychotic medication will be successful for

[Defendant], but could not find enough evidence to support" the substantial

probability standard as required by *Sell*.  *Id.* at 311.

The Court finds Dr. Cosby's opinion and analysis useful in confirming that

delusional disorder in general can be medically treated, but agrees with the

Government's witnesses that the three studies primarily relied upon by Dr. Cosby

are not as relevant to the *Sell* analysis as is the *Cochrane* study.  It is true that the

*Cochrane Study* is lacking in sample size as Dr. Crosby contends.  However, all

three expert witnesses note that delusional disorder is a rare mental disease as

opposed to bipolar disorder or schizophrenia.  *See e.g.*, ECF No. 70 at PageID.362,

387 & 436.  Individuals with delusional disorder are able to function in a normal

capacity outside the circumstances of the specific delusion, and due to the nature of

the psychosis, typically deny having any type of disorder.  ECF No. 70 at

PageID.362-63, 387-88 and 436-37.  Individuals diagnosed with delusional

---

of studies with clinician-rated scales on the pharmacological treatment of
delusional disorder. *International Clinical Psychopharmacology*, 35(3), 129-
136").

disorder are thus unlikely to voluntarily seek treatment because they do not believe that they have the disorder. *Id.* at 392-393. As a result, most studies on restoring competency of individuals with delusional disorder are fewer, smaller in sample size, and have less scientific safeguards in place. *Id.*; ECF No. 65-3 at PageID.306.

When reviewing the evidence, reports and expert testimony presented, the Court finds most persuasive the information and expert opinion that there exists a substantial probability that the involuntary administration of medication will restore Defendant's competency to stand trial. While the studies explained by Dr. Cosby certainly inform the Court that results may vary when medicating individuals diagnosed with delusional disorder in general, they do not inform the Court of whether the level of competency achieved in these tests are comparable to the restoration of competency <u>for trial purposes</u>. As the Government witnesses noted and Dr. Cosby indeed agrees, competency to stand trial does not require delusions to be completely eliminated. ECF 70 at PageID.410. It simply requires that Defendant is able to understand the nature and consequences of the proceedings against him or to assist in his defense. *See* 18 U.S.C. § 4241(d). However, the studies relied on by Dr. Cosby fail to establish that the 32% to 46% rate of improvement of delusional disordered patients were measured based on these individuals' ability to understand the proceedings against them or to assist in

their own defense.  The percentage of patients with delusional disorder who improved is likely significantly higher than indicated if the competency level being measured in the studies relied upon by Dr. Cosby is higher than the level needed to competently stand trial.

On the other hand, the *Cochrane Study* relied on by the Government experts is based on whether the individuals being studied were rendered competent to stand trial through forcible medication.  "The *Cochrane* [*Study*] discusses all mental illnesses, all individuals with a mental disease or disorder treated under *Sell*[.]"  ECF No. 70 at PageID.350.  The *Cochrane Study* is directly relevant to Defendant's case because the study is about (1) individuals with the same delusional disorder as Defendant, (2) who were forcible medicated, and (3) their success rate is based on whether medication rendered them competent to stand trial.  The *Cochrane Study* is a 2013 study based on "a population of people with a variety of psychotic illnesses, including 15 individuals that were diagnosed with delusional disorder."  *Id*. at 350 & 397-98.  In total, there were "132 individuals with a diagnosis of psychotic disorder that were [all] undergoing involuntary treatment" for trial competency purposes  *Id*. at 350 & 373.  The effectiveness of forcible medication for individuals with delusional disorder was 73 percent, and "[t]he restoration rate in general, across the board for all mental illnesses, was 79 percent."  *Id*. at 350-51.

The Court finds that the Government has established by clear and convincing evidence that forcibly medicating Defendant will be substantially likely to restore Defendant's competency to stand trial.  Dr. Cosby criticizes the Government witnesses' reliance on the *Cochrane Study* by arguing that reliance on a single study is flawed especially with the lack of scientific safeguards against bias.  Dr. Cosby also criticizes the Government witnesses' for considering the *Cochrane Study's* results regarding the forcible treatment of all other mental diseases in their calculations of whether there is a substantially likelihood that Defendant can be rendered competent to stand trial.  However, the Government witnesses had the advantage of meeting with and observing Defendant on more than one occasion under different contexts.  They relied on more than the *Cochrane Study*, including their own experiences with other patients and their own observations of Defendant in formal and informal settings.  They also had the benefit of discussing Defendant's treatment with other professionals evaluating Defendant at FMC Butner.  The Government witnesses had the advantage of consulting with Defendant's treatment team, psychiatric nurse practitioner and other psychologists evaluating Defendant.  The Government witnesses had the benefit of far more information regarding Defendant's condition and Dr. Cosby, through no fault of his own, simply did not have the same opportunity to observe the Defendant over a substantial period of time.

There also appears to be emphasis placed on reaching a 70 percent success rate by the expert witnesses because of a Second Circuit case that held that this success rate was sufficient to find that forcibly medicating a defendant was substantially likely to render the defendant competent to stand trial. *See United States v. Gomes*, 387 F.3d 157, 161-62 (2d Cir. 2004). The parties have not cited and the Court is not aware of any Ninth Circuit case that establishes a minimum percentage rate of success needed for the Court to find forcible medication permissible under *Sell*. Nevertheless, the *Cochrane Study* establishes that there is a 73 percent success rate, and even if the sample size in that study was small, the Government's witnesses who relied on this study also considered their own observations and the observations of other professionals who were on Defendant's treatment team at FMC Butner. As a result, the Government's witnesses testimony and reports bolster the *Cochrane Study* and in this Court's view, established by clear and convincing evidence that there is a substantial likelihood that forcible medication will render Defendant competent to stand trial.

### 5.    There are no side Effects that Would Affect Defendant's Ability to be Competent to Stand Trial

Dr. Cloutier is a medical doctor familiar with and able to prescribe the medication that is recommended to restore Defendant's competency to stand trial. *Dr. Cloutier Report* is thorough and meticulous in recommending that the medication risperidone should be administered. ECF No. 65-2 at PageID.277. Dr.

Cloutier explains that "it would be best to start with a medication taken in the past to which Defendant has responded well and which he tolerated with minimal or no side effects." *Id*. When Defendant was previously administered risperidone, "there were no terrible or bad side effects[.]" ECF No. 70 at PageID.362. *Dr. Cloutier Report* explains that "The newer or second-generation antipsychotic medications [such as risperidone] are less likely to have the above side effects [such as neuromuscular side effects and a very low risk of sudden cardiac death], but have metabolic risks such as weight gain, elevated glucose and/or cholesterol." *Id*. at 278. According to Dr. Cloutier, such risks can be managed using "thorough baseline medical evaluation (including medical exam, labs, and EKG) and close monitoring." *Id*. Based upon this information, the Court finds by clear and convincing evidence that there are no known side effects that would affect Defendant's ability to competently stand trial, especially in light of the close monitoring plan that Dr. Cloutier has planned in case one of the potential side-effects should occur during treatment.

C.    **The Third Factor: The Involuntary Administration of Medication is Necessary as There are No Less Intrusive Treatments to Achieve Substantially the Same Results**

Dr. Sharf and Dr. Cloutier opine that there are no less intrusive treatments to achieve substantially the same results as forcibly medicating Defendant. ECF No. 70 at PageID.349. Dr. Sharf stated that "in cases of delusional disorder,

antipsychotic medication is the first line treatment for these types of disorders, and things like psychotherapy are not particularly effective in this realm." *Id*.  Dr. Cloutier stated that "[t]here are no treatments other than . . . antipsychotic medication to effectively treat the illness . . . mediation really is required.  It's very unlikely that the symptoms would remit to a degree where he could be restored to competency without antipsychotic medication."  ECF No. 70 at PageID.372.

In addition, *Dr. Sharf's Report* indicates that Defendant had been attending the Competency Restoration Group during his stay at FMC Butner, which "is an educational/instructional group aimed at increasing pretrial inmates' understanding of the legal process courtroom procedures, and roles and functions of the courtroom participants . . . and rational decision-making."  ECF No. 65-1 at PageID.264.  Defendant had also been attending the Illness Management and Recovery group, which "is a curriculum used to help individuals develop personal strategies for coping with mental illness."  *Id*.  Despite attending these programs, there is no evidence indicating that these alternative treatments were effective in even slightly improving Defendant's condition.   Accordingly, the Court finds that the Government has established by clear and convincing evidence that there are no less intrusive treatments that would achieve substantially the same results as forcibly administering medication.

### D. The Fourth Factor: Administration of the Medication is Medically Appropriate

Under the fourth *Sell* factor, the Court is required to:

> conclude that administration of the drugs is *medically appropriate*, i.e., in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success.

*Sell*, 428 U.S. at 181 (emphasis in original). The experts do not dispute that Defendant was administered risperidone in the past; however, they disagree on whether the single dosage taken is sufficient to establish that the medication is effective. ECF No. 70 at PageID.360-61; ECF No. 65-2 at PageID.277; ECF No. 65-2 at PageID.306. Nevertheless, Defendant had taken the medication risperidone without incident and the Court agrees with Dr. Cloutier recommendation to begin with a medication that Defendant had no immediate, negative reaction to. *See* ECF No. 65-2 at PageID.277. The Court is also reassured by Dr. Cloutier's carefully laid out treatment plan. *Id*. Initially, it is planned that risperidone would be administered in low dosages and will be gradually increased with careful monitoring. There is no evidence that risperidone is not medically appropriate. The Court thus finds that by clear and convincing evidence, that the administration of the medication is medically appropriate.

## **CONCLUSION**

Based upon the foregoing, the Court **FINDS** by the preponderance of the evidence that Defendant suffers from delusional disorder and is mentally incompetent to stand trial pursuant to 18 U.S.C. § 4241(d).  The Court further **FINDS** by clear and convincing evidence that the four *Sell* factors have been met and **RECOMMENDS** that the district court issue an order authorizing the involuntary administration of medication of Defendant to restore his competency to stand trial.

IT IS SO FOUND AND RECOMMENDED.

DATED:  Honolulu, Hawaii, June 28, 2024.

Rom A. Trader
United States Magistrate Judge

---

Cr. No. 22-00061 DKW;  *United States of America vs. Shawn Khoundara*;  Order Determining Defendant Lacks Competence to Stand Trial; and 2) Government's Request for Order Authorizing involuntary medication to Restore Competence to Stand Trial