# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHAWN KHOUNDARA,<br><br>Defendant. | Case No. 22-cr-00061-DKW<br><br>**ORDER (1) OVERRULING DEFENDANT'S OBJECTIONS; (2) ADOPTING MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION; AND (3) AUTHORIZING THE INVOLUNTARY ADMINISTRATION OF MEDICATION TO RESTORE COMPETENCY TO STAND TRIAL[1]** |

Before the Court are Defendant Shawn Khoundara's Objections to the United States Magistrate Judge's Findings and Recommendation ("F&R") to authorize the involuntary administration of antipsychotic medication, pursuant to *Sell v. United States*, 539 U.S. 166 (2003), designed to restore Khoundara's competency to stand trial. Dkt. No. 75. Khoundara raises two challenges to the Magistrate Judge's consideration of the *Sell* factors: (1) that the Magistrate Judge erred in finding that there is an important governmental interest in bringing Khoundara to trial; and (2) that the Magistrate Judge erred in finding that the

---

[1]Pursuant to Criminal Local Rule 12.2(a), the Court finds this matter suitable for disposition without a hearing.

administration of antipsychotic medication would be substantially likely to restore Khoundara to competency.  *Id.* at 1, 6.

Having reviewed the F&R, Khoundara's Objections, and the record generally, the Court disagrees on both grounds.  Although Khoundara makes much of the fact that the Sentencing Guidelines provide for a relatively short period of incarceration for his charged offense and there are various "safeguards" in place to protect the community apart from any sentence, including a pending federal civil commitment proceeding and state term of probation, these considerations do not diminish the seriousness of Khoundara's alleged conduct and the Government's interest in bringing him to trial.  Moreover, upon independent review of the expert testimony, reports, and studies, the Court agrees with the Magistrate Judge that there is a substantial likelihood that the involuntary administration of antipsychotic medication would render Khoundara competent to stand trial.  Accordingly, as more fully discussed herein, Khoundara's Objections, Dkt. No. 75, are OVERRULED, the F&R, Dkt. No. 74, is ADOPTED, and the Bureau of Prisons ("BOP") is AUTHORIZED to involuntarily administer medication to Khoundara.

## FACTUAL & PROCEDURAL BACKGROUND[2]

On July 20, 2022, Defendant Shawn Khoundara was arrested following the filing of a Criminal Complaint that charged him with cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B).  Dkt. No. 1.  Shortly thereafter, on July 28, 2022, a Grand Jury returned an Indictment for the same offense, alleging that between February 2022 and July 2022, Khoundara:

> with the intent to harass and intimidate another person, specifically Adult Female 1, used an interactive computer service, electronic communication service, electronic communication system of interstate commerce, and facility of interstate and foreign commerce, including but not limited to the Internet and cellular telephone networks, to engage in a course of conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to Adult Female 1.

Dkt. No. 13 at 2.  On August 2, 2022, finding that there was no condition or combination thereof that would reasonably assure Khoundara's appearance at court proceedings and the safety of the community, the Magistrate Judge ordered Khoundara detained pending trial.  Dkt. No. 19 at 2.

On October 11, 2022, Khoundara filed an unopposed Motion for Competency Evaluation.  Dkt. Nos. 28 & 31.  The Magistrate Judge granted the motion and remanded Khoundara to the care and custody of the Attorney General

---

[2]The Court assumes the parties' familiarity with the procedural and factual background of this case and, thus, only sets forth the background necessary for an understanding of the instant issues.  A more detailed and undisputed version is set forth in the F&R, *see* Dkt. No. 74 at 2–5, and will not be repeated here.

to be evaluated for competency at a BOP facility.  Dkt. No. 33.  Following

Khoundara's transfer to FDC SeaTac for that purpose, he was evaluated by Dr.

Cynthia Low, Ph.D., who prepared a report diagnosing Khoundara with a mental

disorder—specifically, delusional disorder, grandiose and persecutory types—

which would substantially impair his ability to assist counsel in his defense.  Dkt.

No. 38.  After the parties stipulated to Dr. Low's report and conclusions, the

Magistrate Judge found that Khoundara was incompetent to stand trial and

committed him to the continued custody of the Attorney General to undergo

treatment and competency restoration at another BOP facility.  Dkt. Nos. 42 & 43.

Following several delays, on May 16, 2023, Khoundara was transferred to

FMC Butner—a BOP medical facility located in Butner, North Carolina.  Dkt. No.

46.  There, Dr. Allyson Sharf, Ph.D. evaluated Khoundara and diagnosed him with

a mental disease or disorder—namely, delusional disorder, persecutory type—

which rendered him incompetent to stand trial.  Dkt. No. 47.  Nevertheless, Dr.

Sharf also opined that there was a substantial probability Khoundara could be

restored to competency in the future with the administration of antipsychotic

medication.  *Id.* at 13–14.  Due to Khoundara's refusal to voluntarily accept such

treatment, Dr. Sharf indicated that any such efforts would require an order for

involuntary medication pursuant to *Sell*.  *Id.*

Following this determination, on October 2, 2023, the United States
Attorney for the Eastern District of North Carolina[3] filed a Certificate of Mental
Disease or Defect and Dangerousness.  Dkt. No. 52-1.  In doing so, the
Government requested that Khoundara be civilly committed should this Court find
him to be unable to be restored to competency.[4]  *Id.* at 1, 4.

On October 11, 2023, the Magistrate Judge held a status conference at which
defense counsel represented that Khoundara intended to contest Dr. Sharf's
findings and opinions as well as retain his own defense expert for the eventual
competency hearing.  Dkt. No. 53.  The Magistrate Judge thus ordered that
Khoundara be transported back to the District of Hawaiʻi and that FMC Butner
submit an Addendum to Dr. Sharf's report with a "proposed treatment plan, to
include recommended medication and dosage, as well as, other forensic
information, findings or opinions relating to the factors required under *Sell v.
United States*."  *Id.*

On November 1, 2023, Dr. Charles Cloutier, M.D. filed the requested
Addendum on behalf of FMC Butner.  Dkt. No. 59.  Therein, Dr. Cloutier
confirmed Khoundara's diagnosis of delusional disorder, persecutory type and set

---

[3]FMC Butner is located within the Eastern District of North Carolina.  *See FMC Butner*, FED.
BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/buh/ (last visited Sept. 20,
2024).
[4]At the Government's request, the U.S. District Court for the Eastern District of North Carolina
stayed the civil commitment proceedings, pending this Court's final determination on
Khoundara's competency.  Dkt. No. 52-5.

forth a proposed treatment plan involving the administration of antipsychotic medication which would be "substantially likely to render him competent to stand trial." *Id.* at 4–6.[5]

On January 26, 2024, following supplemental briefing from the parties, the Magistrate Judge held a competency hearing. *See* Dkt. Nos. 62, 65, 68, 69, 70. There, both sides agreed that Khoundara was currently incompetent to stand trial. Dkt. No. 69; Dkt. No. 70 at 4. As a result, the hearing focused primarily on whether Khoundara may be involuntarily medicated pursuant to *Sell* in order to restore him to competency. *See generally* Dkt. No. 70. The Government presented testimony from Dr. Sharf and Dr. Cloutier, while Khoundara presented testimony from his own independent expert—Dr. Robert Cosby, Psy.D.—whose report had been filed as a part of the supplemental briefing. *See* Dkt. Nos. 65-3, 69, 70. While Dr. Cosby concurred with a diagnosis of delusional disorder, grandiose and persecutory types, he suggested that there was insufficient evidence to conclude that the administration of antipsychotic medication would be substantially likely to restore Khoundara to competency. *See* Dkt. No. 65-3 at 12, 16–22; Dkt. No. 70 at 79–112.

---

[5]In citing to Dr. Cloutier's report, the Court utilizes the page numbers assigned by CM/ECF in the top right corner of each page, rather than the page numbers at the bottom of each page, because the latter does not extend consistently throughout the entire document.

On June 28, 2024, the Magistrate Judge entered the instant F&R.  Dkt. No. 74.  Therein, the Magistrate Judge found: (1) that Khoundara's delusional disorder renders him incompetent to stand trial; and (2) that the Government had satisfied each of the four *Sell* factors by clear and convincing evidence.  *Id.* at 6–36.  Consequently, the Magistrate Judge recommended that this Court issue an Order authorizing the BOP to involuntarily medicate Khoundara to restore him to competency to stand trial.  *Id.* at 37.

On July 10, 2024, Khoundara filed Objections to the F&R in which he claimed that the Magistrate Judge erred by finding: (1) that the Government has an important interest in bringing him to trial; and (2) that the administration of antipsychotic medication is substantially likely to restore him to competency.  Dkt. No. 75.  The Government did not respond, and this Order now follows.

## STANDARD OF REVIEW

Pursuant to Title 28 of the United States Code, Section 636, when reviewing a Magistrate Judge's Findings and Recommendation, the District Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."[6]  28 U.S.C.

---

[6]Although a pretrial order issued by a Magistrate Judge is usually reviewed for clear error, because "magistrate judges lack authority to issue final orders authorizing the involuntary administration of medication," such determinations must be treated as "proposed findings and recommendations" and reviewed *de novo*.  *See* 28 U.S.C. § 636(b)(1)(A); *United States v. Rivera-Guerrero*, 377 F.3d 1064, 1070–72 (9th Cir. 2004).

§ 636(b)(1)(C).  The Court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" or "recommit the matter to the magistrate judge with instructions."  *Id.*

## DISCUSSION

The Supreme Court has repeatedly recognized that there is a "liberty interest in freedom from unwanted antipsychotic drugs" under the Due Process Clause of the Fourteenth Amendment.  *United States v. Williams*, 356 F.3d 1045, 1053 (9th Cir. 2004) (quotation marks and citation omitted).  As such, although "the Constitution permits the Government to involuntarily administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial," the Government may do so only if the Court finds that: (1) "*important* governmental interests are at stake;" (2) "involuntary medication will *significantly further* those concomitant state interests;" (3) "involuntary medication is *necessary* to further those interests;" and (4) "administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition."  539 U.S. at 179–81.  Because such orders are generally disfavored, the Government must prove each factor by clear and convincing evidence.  *United States v. Onuoha*, 820 F.3d 1049, 1053–54 (9th Cir. 2016).

Here, Khoundara objects only to the Magistrate Judge's findings as to the first two *Sell* factors. *See* Dkt. No. 75 at 18. The Court addresses each in turn.

## I. The First Factor: Important Governmental Interest

Under *Sell*, the Court must "first address whether important governmental interests support prosecuting" the defendant. *Onuoha*, 820 F.3d at 1054; *Sell*, 539 U.S. at 180. Such determination is a two-step inquiry. *Onuoha*, 820 F.3d at 1054. First, the Court must consider "whether the alleged crime is sufficiently 'serious' to establish an important governmental interest." *Id.* If so, the Court must then "evaluate in the second step of this analysis whether any 'special circumstances' lessen that interest." *Id.*

### A. Seriousness of the Alleged Crime

The Court thus begins with considering whether Khoundara's alleged criminal conduct is sufficiently serious to constitute an important government interest. *See Sell*, 539 U.S. at 180. In undertaking this analysis, the Ninth Circuit has instructed that the "U.S. Sentencing Guidelines range is the appropriate starting point because it is the best available predictor of the length of a defendant's incarceration." *Onuoha*, 820 F.3d at 1054–55 (quotation marks and citation omitted).

Here, although Khoundara concedes that "[c]yberstalking . . . is no doubt a serious crime," he claims that "in the context of federal crimes, this offense lands

on the less severe side of the scale." Dkt. No. 75 at 2.  Specifically, Khoundara

argues that under the Sentencing Guidelines, his total offense level would likely be

17, which, when combined with a criminal history category of I, would result in a

suggested Guidelines range of 24 to 30 months of incarceration.[7]  *Id.*  Such range

is comparable to the 27 to 33 month range in *Onuoha*, which the Ninth Circuit

found to be "lower than any range we have previously held to be indicative of a

'serious' crime under the first *Sell* factor."  *See* 820 F.3d at 1055.  As such,

Khoundara claims that "given the short term of incarceration suggested by the

guidelines, they do not, by themselves, support finding an important governmental

interest exists in prosecuting Mr. Khoundara."  Dkt. No. 75 at 2.

Even assuming that Khoundara's likely Guidelines range would not render

his crime "serious" within the meaning of *Sell*, "it is not the only factor that should

be considered."  *See Onuoha*, 820 F.3d at 1055 (quotation marks and citation

omitted).  Rather, "[i]n addition to the Guidelines range," the Court "must consider

the facts of the individual case," including "the specific facts of the alleged crime

as well as the defendant's criminal history."  *Id.*  And, as Khoundara admits, "[t]he

facts of this case . . . allege relatively serious conduct."  Dkt. No. 75 at 3.

---

[7]In prior briefing before the Magistrate Judge, the Government did not provide any estimation as to Khoundara's likely Guidelines range, but instead focused on the fact that "[t]he defendant is facing a maximum term of imprisonment of five years for the charged crime."  Dkt. No. 68 at 7. In the Ninth Circuit, however, "the likely guideline range," not the maximum term of incarceration, "is the appropriate starting point for the analysis of a crime's seriousness."  *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008).

According to the Complaint, between February 2022 and June 2022, Khoundara engaged in a prolonged campaign to harass and intimidate Adult Female 1 ("AF1")—a woman in which he was sexually interested.  Dkt. No. 1 at 2.  Among other things, Khoundara apparently believed that AF1 was being sex trafficked and thus repeatedly bombarded her and others with text messages,[8] posted information about her on online forums,[9] made multiple reports about her to law enforcement, and, at one point, entered a Honolulu massage establishment, armed with a knife and bulletproof vest, and brandished a stick at employees while claiming that he was working with Homeland Security to save AF1 from kidnapping.  *See id.* at 3–14.  Moreover, although not charged as offense conduct, the Government alleges that Khoundara was driving around in a van with a metal cage and weapons in an attempt to kidnap and sexually assault AF1.  Dkt. No. 68 at 8.  Due to this behavior, AF1 "no longer [felt] safe" and "changed her everyday behavior"

---

[8]These included messages to AF1, such as: "Dear, I can make this difficult for everyone just book me and get this over with, cause I have 5 phones and 15 different numbers already I can have someone do the screening for me and have them wait for u for me, its better u just see me and not have it interfere with the other calls cause I will make it hard for u to see anyone . . ., just see me once and u don't have to see me for a long time later, but I'm gonna see u whatever it takes on gonna do if I have , I don't want to put u through the rouble but I will if u don't see me .!" and "No matter how u change things im gonna be around until we diothis."  *See* Dkt. No. 1 at 11.

[9]In fact, Khoundara allegedly created a subreddit focused entirely on AF1 and his belief that she was being sex trafficked.  *See* Dkt. No. 1 at 5–6.  There, his posts included images of firearms and women engaged in sexually explicit acts as well as messages such as "to u people who think of trying shit with me, u should know im a very violent person if i dont know u i dont even think twive about hurting u, dont get in my way or the woind u get is going last u the rest of ur life.." and "u know ir the reason y shes gonna die…!"  *See id.* at 6–9.

including by obtaining a new phone number, blocking Khoundara's phone number, constantly monitoring her surroundings, filing a harassment complaint against Khoundara with the Honolulu Police Department, and obtaining state court injunctions which prohibited Khoundara from contacting, threatening, or harassing her.  Dkt. No. 1 at 3–4, 10.  Thus, although the applicable Guidelines range may be relatively short, Khoundara's conduct is, by any sense of the word, "serious" in nature.[10]  *Cf. United States v. Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014) (finding a serious government interest in bringing to trial a defendant "accused of making lurid and distressing threats . . . to, among other things, choke, rape, and kill people" which "continued for over a year, escalating in volume and violence" and who "evidenced a possible intent and ability to carry out th[e] threats.").  As such, the Court finds that the Government has successfully established an important interest in prosecuting Khoundara for the instant offense.

## B.   <u>Special Circumstances</u>

Having found that the Government has a serious interest in bringing Khoundara to trial, the Court must next consider whether there are any special

---

[10]It is also notable that although Khoundara may have "had no prior criminal *convictions* when this crime is alleged to have occurred," he was already facing criminal *prosecution* by the State of Hawaiʻi.  *See* Dkt. No. 75 at 3, 3 n.3 (emphasis added); *State v. Khoundara*, No. 1CPC-21-0000730 (Haw. Cir. Ct. June 25, 2021); *State v. Khoundara*, No. 1CPC-22-0001370 (Haw. Cir. Ct. Oct. 25, 2022).  Indeed, Khoundara recently pled no contest to Terroristic Threatening in the First Degree—a class C felony—and was sentenced to four years of state probation.  *See* Dkt. No. 75 at 3 n.3; *Khoundara*, No. 1CPC-21-0000730, Dkt. No. 175.

- 12 -

circumstances which might diminish that interest. *See Sell*, 539 U.S. at 180; *Onuoha*, 820 F.3d at 1054. These may include, *inter alia*, "the potential for civil commitment, the length of time needed to restore a defendant to competency, the effect of the potential delay on the government's interest in timely prosecution, the length of time the defendant has already been confined, and constitutional requirements of a fair trial." *Onuoha*, 820 F.3d at 1054.

Here, Khoundara claims that "[s]everal special circumstances exist in Mr. Khoundara's case including the extended time he has been in custody, pending civil commitment, and state probation which all serve to substantially diminish the government's interest in prosecuting him." Dkt. No. 75 at 3. Specifically, Khoundara explains that he has been in custody for approximately 24 months[11] which, "when considered in context of the 5-year maximum possible sentence and the 24-30 months of imprisonment suggested by the guideline range, is substantial." *Id.* at 4. Moreover, Khoundara also notes that "[i]f the Court orders that he be forcibly medicated, there will be additional delays" such that "[b]y the time this case could even begin to be prosecuted, he will have served a length of imprisonment on the high end of the guideline range, if not more, and there will only be approximately two years left on any potential term of imprisonment." *Id.*

---

[11]As of the date of the instant Order, it appears that Khoundara has been in custody for approximately 26 months following his arrest on July 20, 2022. *See* Dkt. No. 8.

Finally, Khoundara argues that the pending federal civil commitment proceeding in the Eastern District of North Carolina and the four-year term of state probation serve as "safeguards" as Khoundara would not be released into the community unless he was found to "no longer create a substantial risk of bodily injury to another person or serious damage to property of another" and would be under strict restrictions and close monitoring by state and/or federal officials. *See id.* at 4–6 (citing 18 U.S.C. § 4246(e)(1)).

Such arguments are unpersuasive. First, as already discussed above, *supra* 10–11, notwithstanding the relatively low estimated Guidelines range, Khoundara's alleged conduct is extremely serious in nature.[12] To this end, even if Khoundara could potentially face a time-served sentence, "there is an important distinction between incarceration itself, and the significance for society of gaining a criminal conviction for a defendant's violation of the law."[13] *Onuoha*, 820 F.3d at 1056. For example, beyond the specific deterrence, punishment, and rehabilitation of the individual defendant, "general deterrence for the benefit of society is served when a person is convicted of a serious crime, thus deterring

---

[12]Of course, it is also difficult at this stage of the proceedings to calculate the estimated Guideline range with any certainty. *See* Dkt. No. 75 at 2 (making assumptions regarding special offense characteristics and acceptance of responsibility that would affect Khoundara's calculated offense level).

[13]Moreover, even a time-served sentence might include an additional period of supervised release which "would help ensure that [Khoundara] does not return to [criminal conduct] when released into the public." *See Gillenwater*, 749 F.3d at 1102; *Onuoha*, 820 F.3d at 1056.

others from making the same mistake." *Id.* at 1057.  As such, the length of

Khoundara's current detention—whether in relation to the estimated Guidelines

range or the 5-year maximum sentence—does not constitute a special circumstance

which diminishes the Government's interest in bringing him to trial.

In addition, the pending federal civil commitment proceedings and state term

of probation do not provide the "safeguards" Khoundara claims.  *See Sell*, 539 U.S.

at 180 (explaining that "[t]he potential for future confinement affects, but does not

totally undermine, the strength of the need for prosecution.").  Notably, as the

Magistrate Judge also explained, any "safeguard" provided by the civil

commitment proceedings is essentially negated by the fact that "there is no

indication that there is any degree of certainty that Defendant will be civilly

committed." Dkt. No. 74 at 16.  In fact, Khoundara's civil commitment case is

currently being held "in abeyance pending resolution of [his] competency and

restorability by the United States District Court for the District of Hawaii." Dkt.

No. 52-5 at 1.  Put differently, there is no guarantee that Khoundara's civil

commitment proceedings will actually take place, let alone that he will be

committed and/or monitored until such point as he no longer poses "a substantial

risk of bodily injury to another person or serious damage to property of another."

*See* Dkt. No. 75 at 5 (quoting 18 U.S.C. § 4246(e)(1)).  As such, the mere prospect

of such proceedings does not constitute a special circumstance which diminishes the strength of the Government's interest under *Sell*.

Similarly, although Khoundara argues that his four-year state term of probation is an additional "safeguard" that diminishes the Government's interest in bringing him to trial, it is entirely unclear as to why this must be so.  While Khoundara lists some of the terms and conditions of his probation—including restrictions on his use and possession of substances, participation in substance abuse treatment and mental health treatment, and compliance with curfew restrictions—he makes no attempt to explain *how* such requirements might minimize the Government's interest in this prosecution beyond claiming that they provide "substantial court oversight regarding his conduct in this community."[14] *See* Dkt. No. 75 at 6; Dkt. No. 75-1 at 3–5.  In other words, Khoundara fails to acknowledge, let alone address, any of the Government's other potential objectives in prosecution and punishment beyond simply the public safety.  *See supra* 14; *Onuoha*, 820 F.3d at 1056.  As a result, this Court cannot find that Khoundara's state term of probation constitutes a special circumstance which minimizes the Government's important interest in prosecuting Khoundara for the instant offense.

---

[14]Although Dr. Low diagnosed Khoundara with an unspecified methamphetamine-related disorder, there has been no suggestion by any party that substances played a role in Khoundara's alleged conduct.  *See* Dkt. No. 38 at 9–10 (noting Khoundara's history of methamphetamine use); *but see* Dkt 47 at 10 (finding insufficient evidence that Khoundara's substance use caused clinical impairment); Dkt. No. 65-3 at 14 (same).

In sum, the Court holds that the Magistrate Judge did not err in finding that the Government has an important interest in bringing Khoundara to trial, which has not been diminished by any special circumstances.  Khoundara's Objection as to the first *Sell* factor is therefore OVERRULED.

## II.     The Second Factor: Involuntary Medication Will Significantly Further Government Interests

The Court turns to the second *Sell* factor.  Under this factor, "the government must make a two-part showing to establish that involuntary medication will significantly further the important governmental interests at stake." *See Gillenwater*, 749 F.3d at 1102; *Sell*, 539 U.S. at 181.  Specifically, the Government must prove: (1) "that administration of the drugs is substantially likely to render the defendant competent to stand trial;" and (2) that it is "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181.

Here, Khoundara objects only to the Magistrate Judge's finding that the involuntary administration of antipsychotic medication is substantially likely to render him competent to stand trial.  Dkt. No. 75 at 6–18.  By way of background, at the *Sell* hearing, both of the Government's experts—Dr. Sharf and Dr. Cloutier—testified that there is a substantial likelihood that the administration of antipsychotic medication would restore Khoundara to competency.  *See* Dkt. No.

- 17 -

70 at 17–20, 36–37, 42–53.  In doing so, they relied, *inter alia*, upon two observational studies—the Cochrane study[15] and the Herbel & Stelmach study[16]—which documented a success rate of over 70% in restoring defendants diagnosed with delusional disorder to competency with the involuntary administration of antipsychotic medication under *Sell*.[17]  *See id.* at 17–22, 37, 43–45, 51–53; Dkt. No. 59 at 4, 8–9.  Khoundara's expert—Dr. Cosby—disagreed.  According to Dr. Cosby, both the Cochrane and the Herbel & Stelmach studies suffered from significant flaws, including a small sample size,[18] lack of a control group, and a retrospective perspective, which limited their generalizability.  Dkt. No. 70 at 85–91.  Dr. Cosby instead placed greater significance on three larger-scale studies which focused more generally on the response of patients with delusional disorder to antipsychotic medication outside of the *Sell* context.[19]  *See id.* at 93–102; Dkt.

---

[15]Robert E. Cochrane, *et al*., *The Sell Effect: Involuntary Medication Treatment is a "Clear and Convincing" Success*, 37 L. & HUM. BEHAV. 107 (2013).

[16]Byron L. Herbel & Hans Stelmach, *Involuntary Medication Treatment for Competency Restoration of 22 Defendants with Delusional Disorder*, 35 J. AM. ACAD. PSYCHIATRY & L. 47 (2007).

[17]As the Magistrate Judge noted, the expert witnesses appear to focus on a 70% competency restoration threshold because of a Second Circuit case identifying this success rate as sufficient to constitute a "substantial probability" of restoration under *Sell*.  *See* Dkt. No. 74 at 33; *United States v. Gomes*, 387 F.3d 157, 161–62 (2d Cir. 2004).  To the Court's knowledge, the Ninth Circuit has yet to speak on this issue.  Nevertheless, because Khoundara does not object to the appropriateness of the 70% threshold, the Court need not and does not decide whether that percentage is generally sufficient to find a defendant is "substantially likely" to be restored to competency with the administration of involuntary medication pursuant to *Sell*.

[18]The Cochrane study had 15 participants with delusional disorder and the Herbel & Stelmach study had 22 such participants.  *See* Dkt. No. 59 at 9.

[19]*See* Markku Lähteenvuo et al., *Effectiveness of Pharmacotherapies for Delusional Disorder in a Swedish National Cohort of 9076 Patients*, 228 SCHIZOPHRENIA RSCH 367 (2021); José

No. 65-3 at 19–20.  These studies, which "had few of the caveats noted about the [Herbel & Stelmach] study," found that only 32% to 46% of patients hospitalized with delusional disorder responded favorably to antipsychotic medication.[20]  *See* Dkt. No. 65-3 at 19–20; Dkt. No. 70 at 96–100.  Thus, Dr. Cosby concluded that while there may be "a reasonable likelihood that Mr. Khoundara could be restored . . . [a] substantial probability is a higher threshold than reasonable.  And with all those limitations and information that I do have, I don't see enough evidence to assertively say that."  *See* Dkt. No. 70 at 101–02; Dkt. No. 65-3 at 16–22 (stating the same in his report).

In the F&R, the Magistrate Judge sided with Drs. Sharf and Cloutier, explaining that their "testimony and reports bolster the *Cochrane Study* and in this Court's view, established by clear and convincing evidence that there is a substantial likelihood that forcible medication will render Defendant competent to stand trial."  Dkt. No. 74 at 33.  Khoundara asserts that this was error because

---

Eduardo Muñoz-Negro & Jorge A. Cervilla, *A Systematic Review on the Pharmacological Treatment of Delusional Disorder*, 36 J. CLINICAL PSYCHOPHARMACOLOGY 684 (2016); José Eduardo Muñoz-Negro et al., *A Systematic Review of Studies with Clinician-Rated Scales on the Pharmacological Treatment of Delusional Disorder*, 35 INT'L CLINICAL PSYCHOPHARMACOLOGY 129 (2020).

[20]Specifically, the Lähteenvuo study found that 46% of patients hospitalized with delusional disorder who were routinely treated with antipsychotic medications did not experience rehospitalization within 5 years.  *See* Dkt. No. 65-3 at 19–20.  The 2016 Muñoz-Negro study found that 33.6% of patients with delusional disorder achieved a "good treatment response" to antipsychotic medication.  *Id.* at 20.  This finding was echoed in the 2020 Muñoz-Negro study, which found 32.3% of patients with delusional disorder achieved a "good treatment response" to antipsychotic medication, meaning a 50% or greater improvement in symptoms from admission to discharge.  *Id.*

while Drs. Sharf, Cloutier, and Cosby "[e]ach . . . testified credibly," the "main problem with Delusional Disorder is just the lack of information around how to treat it."  Dkt. No. 75 at 17.  In particular, Khoundara maintains that because of the methodological flaws that Dr. Cosby identified, the Cochrane and Herbel & Stelmach studies are not "scientifically appropriate to a find[ing] that there is a substantial likelihood the medication would work as required by law."  *See id.* at 18; *see also* Dkt. No. 70 at 60–72 (cross-examining Dr. Cloutier about the methodological flaws in the Cochrane and Herbel & Stelmach studies).  As such, Khoundara concludes that because the Government has "not met its burden in demonstrating a substantial likelihood that involuntary medication will render [him] competent," the Court cannot "forc[e] Mr. Khoundara to take medication against his will for an unusual disorder without a substantial certainty of its efficacy."  Dkt. No. 75 at 13.

Although the Court acknowledges that the Cochrane and Herbel & Stelmach studies suffer from certain limitations, including their small sample size, they are nevertheless persuasive because they focus on precisely the inquiry at hand—that is, the percentage of defendants with delusional disorder who were restored to competency following the involuntary administration of antipsychotic medication.  *See* Dkt. No. 59 at 8–9.  The studies Dr. Cosby cites, on the other hand, focus on different benchmarks, such as five-year rehospitalization rates or the percentage of

patients who achieve a 50% or greater reduction in symptoms.  *See* Dkt. No. 65-3 at 19–20.  Such findings are not neatly translatable to the *Sell* inquiry, in no small part because "competency does not require the delusions to be completely eliminated" or even reduced by a specified amount.  *See* Dkt. No. 70 at 81.  Rather, for a defendant to be found competent, "the intensity of [his] delusional beliefs or symptoms" must simply be "diminish[ed]" to the point where he is once again able to "understand the nature and consequences of the proceedings against him or to assist properly in his defense."  *See* Dkt. No. 70 at 50; 18 U.S.C. § 4241(a).  As such, it may be possible for a defendant to be restored to competency while still failing to meet the criteria for improvement examined by the studies on which Dr. Cosby relies.[21]

Moreover, as the Magistrate Judge noted, Drs. Sharf and Cloutier's opinions were not based *solely* on the Cochrane and Herbel & Stelmach studies.  *See* Dkt. No. 74 at 26–27, 32–33.  Rather, in addition to considering the literature, Dr. Sharf drew upon her previous experience treating five patients diagnosed with delusional disorder, biweekly meetings with Khoundara, discussions with his care team as to his prognosis and potential treatment, and review of his medical records, history

---

[21]For example, although Khoundara claims that "for someone to be readmitted to a hospital, their behavior must be quite disruptive," that person may still be found competent to stand trial so long as such behavior does not interfere with his ability to understand or comprehend the proceedings against him or properly assist in his own defense.  *See* Dkt. No. 75 at 16.

and physical examination, EKG, magnetic resonance imaging – brain, revised competency assessment interview notes, competency restoration group notes, behavioral observation notes, clinical interview notes, the Indictment, the criminal docket, Dr. Low's report, and discovery material provided by the Government. *See* Dkt. No. 47 at 2–10; Dkt. No. 70 at 15–17, 33–36.  Similarly, in addition to the Cochrane and Herbel & Stelmach studies, Dr. Cloutier based his opinion on his review of Khoundara's medical and legal records, discussions with Khoundara's care team, meetings with Khoundara, and prior experience treating twelve patients with delusional disorder, including patients on whom Dr. Cloutier testified pursuant to *Sell*.  *See* Dkt. No. 59 at 2–3; Dkt. No. 70 at 42, 46; Dkt. No. 75 at 11. Though Khoundara claims that "[n]one of this provides insight into the likelihood of Mr. Khoundara's competency being restored," the Court disagrees.  *See* Dkt. No. 75 at 8–9, 11, 17–18; Dkt. No. 70 at 37–38, 74.  Even if limited, Drs. Sharf and Cloutier's experience with defendants with delusional disorder, when combined with their familiarity with Khoundara and his treatment thus far, places them in a unique position to consider whether the administration of antipsychotic medication is substantially likely to restore Khoundara to competency.  *See* Dkt. No. 70 at 20, 35–37, 42–46, 52–53, 73; Dkt. No. 47 at 4–9, 12–13; Dkt. No. 59 at 3–4.  As such, their opinions carry additional weight.  *See United States v. Baschmann*, 2015 WL 346719, at *11 (W.D.N.Y. Jan. 23, 2015) (giving weight to

an expert who "has, through his experience and judgment, been able to gauge which patients will respond well to medication and which will not"); *United States v. Decoteau*, 904 F. Supp. 2d 235, 241 (E.D.N.Y. 2012) (finding "strong" evidence to support a substantial likelihood of restoration where "the government called to the stand an experienced BOP professional with direct knowledge of the defendant's condition" who "drew on his experience treating patients with psychotic disorders to formulate his opinion.").

After careful consideration of the cited studies as well as Drs. Sharf, Cloutier, and Cosby's reports and testimony, the Court finds that the Government has established by clear and convincing evidence that the forcible administration of antipsychotic medication is substantially likely to restore Khoundara's competency to stand trial. Khoundara's Objection as to the second *Sell* factor is therefore OVERRULED.

## **CONCLUSION**

For the reasons set forth herein, Khoundara's Objections, Dkt. No. 75, are OVERRULED, and the F&R, Dkt. No. 74, is ADOPTED.[22] The Bureau of Prisons is AUTHORIZED[23] to administer medication to Khoundara as follows:

---

[22]Because Khoundara does not challenge the Magistrate Judge's findings as to the third and fourth *Sell* factors, the Court ADOPTS those findings without objection. *See* Dkt. No. 75 at 18; Dkt. No. 74 at 34–36.

[23]The Ninth Circuit has instructed that when a district court authorizes the administration of involuntary medication pursuant to *Sell*, it must, at a minimum, identify:

- The Bureau of Prisons may administer antipsychotic and adjudicative medication to Khoundara, voluntarily or involuntarily, pursuant to the procedures laid out in Dr. Cloutier's proposed treatment plan. *See* Dkt. No. 59 at 4–5, 12–14.

- With regard to antipsychotic medication, the BOP may administer injectable formulations of risperidone, haloperidol lactate, haloperidol decanoate, and/or fluphenazine decanoate as well as oral formulations of risperidone, aripiprazole, olanzapine, ziprasidone, fluphenazine, haloperidol, and/or perphenazine at dosages and frequencies no greater than those specified in the proposed treatment plan. *See id*.

- The BOP is also authorized to administer adjunctive treatments— specifically, anticholinergics, benzodiazepines, or mood stabilizers—as necessary and appropriate to mitigate side effects or improve treatment response, at dosages no greater than those specified in the proposed treatment plan. These may include benztropine, propranolol, and/or lorazepam. *See id.* at 5, 14.

---

(1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress.

*Hernandez-Vasquez*, 513 F.3d at 916–17.

- 24 -

- Treatment may not, absent further authorization by this Court, continue for more than eight months from the date that medication is first administered pursuant to this Order.[24]

The BOP must file a status report every 60 days regarding Khoundara's treatment, including, at a minimum: (1) the medications and dosages he has received and is expected to receive; (2) any changes to his treatment; and (3) the status of his restoration to competency. In the meantime, any party may move to alter this Order as circumstances change and more becomes known about Khoundara's response to treatment.[25]

IT IS SO ORDERED.

DATED: September 24, 2024 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

United States of America v. Shawn Khoundara; Cr. 22-00061 DKW; **ORDER (1) OVERRULING DEFENDANT'S OBJECTIONS; (2) ADOPTING MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION; AND (3) AUTHORIZING THE INVOLUNTARY ADMINISTRATION OF MEDICATION TO RESTORE COMPETENCY TO STAND TRIAL**

---

[24]According to Dr. Cloutier, it will likely take four to eight months of treatment with antipsychotic medication to restore Khoundara to competency. *See* Dkt. No. 59 at 4.
[25]At present, neither Khoundara nor the Government have expressed any position with regard to Dr. Cloutier's proposed treatment plan, the length of treatment, or the frequency of status reports and/or conferences.